### NEENAN v. OTIS ELEVATOR CO.

(Circuit Court of Appeals, Second Circuit. January 9, 1912.)

No. 123.

1. PATENTS (§ 202*)—CONTRACT OF ASSIGNMENT—CONSTRUCTION.

Under a contract by which complainant assigned certain patents relating to elevators to defendant, a builder of elevators, which required defendant to test the patented apparatus with reasonable diligence, and if such test proved satisfactory "within such further reasonable time as

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

is convenient to put such apparatus into practical use" and to pay royalties thereon, the test having proved satisfactory, complainant was entitled to have the inventions exploited during the life of the patents and within a reasonable time.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 281–289; Dec. Dig. § 202.*]

2. PATENTS (§ 202*)—CONTRACT OF ASSIGNMENT—RESCISSION IN EQUITY.

The failure and refusal by defendant, although continuously building and installing elevators, to make any practical use of such invention for five years after the making of the contract, was a violation both of its spirit and letter which entitled complainant to its rescission in equity; there being no rational rule of damages which would afford an adequate remedy at law.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 281–289; Dec. Dig. § 202.*]

Appeal from the Circuit Court of the United States for the Southern District of New York.

Suit in equity by Michael C. Neenan against the Otis Elevator Company. Decree for complainant, and defendant appeals. Affirmed. See, also, 180 Fed. 997.

The following are the statement of the case and the opinion of the court below:

This cause now comes up for final hearing after the taking of more testimony by both sides designed to show the extent of the defendant's default. The original facts as contained in the testimony first taken are set forth in the opinion of this court filed on June 2, 1910. 180 Fed. 997. The complainant took advantage of the leave granted him at that time to submit further evidence designed to show that the defendant's default extended to the whole consideration. It appeared upon the first hearing that the defendant had paid the sum of $8,000 mentioned in the seventh article of the contract on April 11, 1907, and that this constituted an election, after the test prescribed in article tenth, to accept the patents and to continue to manufacture elevators under them, although under article eighth the company might cancel the agreement at any time. It now appears that, besides the four buildings which were considered in the first opinion, the defendant between April 11, 1907, and August 1, 1910, by 27 different contracts installed Otis Drum, Traction, or Worm Gear, elevators in 22 buildings in the city of New York, in each of which the complainant claims his own device would have been more practicable and better suited for the use. Of these 27 contracts, 18 were made before February 5, 1909, when suit was brought, and 16 before January 1, 1909, which was the date at which Neenan served his notice upon the defendant that he rescinded the contract. and demanded a reconveyance of the patents.

His proof in regard to the suitability of his own device consists of the testimony of one Ryno, who has had a long experience in the city of New York inspecting elevators, and who testifies that in the case of all of the 22 buildings the Neenan device would have saved space either in sectional area through all the floors or at the top where the motor had in fact in some cases been installed. The complainant himself, who went about with Ryno looking at the elevators, corroborates his judgment and enumerates the changes necessary to put in his own device in place of the Otis elevator. These consist of certain eliminations and certain additions the detail of which it is not necessary to state. This testimony is not answered by any of the defendant's witnesses. The complainant also presented the evidence of an expert electrical engineer, Hanchett, who had had much experience in regard to elevators. In his judgment the Neenan device was superior to the Otis Traction, Worm Gear, or Drum elevators in seven particulars: First, in regard to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the application of traction on the ropes; second, in its elasticity and ability to survive shocks; third, the longer life of the cables; fourth, greater safety; fifth, economy of power; sixth, cheaper maintenance; seventh, cheaper installation. The president of the defendant was called and testified that he had submitted bids for Neenan's device upon only one of the 27 contracts, the Hendrick Hudson building. He also stated that the fact that the complainant had not yet had a commercial test of the device in actual service was one reason for not submitting a bid upon Neenan's device, that he had never advertised the device, and that the defendant did a yearly business of between $1,500,000 and $1,800,000 in the direct traction drive type of machine, but that this figure did not represent the business done in Worm Gear and Drum elevators. This was the complainant's case.

The defendant, in answer to this testimony, put on two witnesses—its sales agent, Charles; and the chief of its estimating department, Hollander. Hollander's testimony contradicts that of Hanchett in respect of the cost of installation, which he believes to be about 12 per cent. greater than for the Otis traction one-to-one equipment. He does not fix the difference in expense between the Neenan system and the Otis Drum, or Worm Gear, elevator, except to say that it is much more expensive. Upon cross-examination Hollander's figures did not work out to an exact percentage; that is, he did not succeed, when called on to give details, in making out an exact percentage of 100 from his several items.

Charles testified to three efforts made to install Neenan's device. The first was in the Park Row building, in which the defendant offered informally to install one elevator for $5,000. Subsequently they gave a bid for ten machines on the same building; $17,500 for the first, and $16,000 for each of the other nine, and last they made a formal proposal to install one machine for $10,000. The negotiations continued after January 1, 1909, and were dropped by the owners themselves. The second proposition was to install the Neenan device in 42 Wall street. The defendant told the owner that they would be willing in this case also to install a machine for $5,000, but nothing was ever done by the owner. The third offer was for the Hendrick Hudson building, in which the defendant formally proposed to put in two Neenan elevators for $22,000, all being high speed, or two Worm Gear low speed elevators for $10,000. The owners accepted the lower offer. In the case of many buildings the architect expresses some desire for one type, or even actually specifies a given type, though ordinarily the matter is open for discussion between the elevator builder and the architect. The defendant hesitates in recommending any type of elevator which has not been tried in actual service, and in this case was looking for a place in which to install one elevator and try it out. This would be preferably in an old building in which one could be installed alone, and taken out without too much loss. Upon none of the other contracts did the defendant make any proposal, nor would it have been willing to do so.

HAND, District Judge. It now appears that the defendant has been waiting before putting the elevators into actual operation for an actual service test, in addition to the factory test mentioned in the contract. Nothing of the sort was stipulated, and indeed I have already held that the defendant was in default in failing to put "said apparatus into practical use" after the test resulted satisfactorily. However, in my view of the case it may be assumed that the defendant had the right to make a service test before offering the device for general commercial use. It must be remembered, nevertheless, that, if so, this became a condition precedent of its own creation upon which the whole exploitation of the patent depended and that it was bound to active diligence to fulfill it. How has it discharged that obligation? There were 18 opportunities before bill filed besides 3 mentioned in the original opinion, and the defendant has not succeeded in installing the first service elevator in a single case. In saying that there were 18, I do not forget the contention that as to 2 contracts let between January 1st and February 5th the complainant's notice put them in risk of an infringement; but I think that their fear of such an infringement was not controlling, as is shown by the fact that they made a new offer to put in the elevator in 42 Wall street after January 1st and continued their negotiations on the Park

Row building after the same date, and also because they actually entered into a contract to manufacture the Neenan device in December, 1910. At that time the case had by no means been decided against the complainant. In regard to those contracts let after February 5, 1909, while it is true that the cause of action must be complete when suit is brought as well in equity as at law, still the actual intention and attitude of the defendant which is the subject of dispute can be tested by what occurred afterwards as well as by what occurred before. It appears therefore that in all 27 contracts were let, in each of which Neenan's device could have been installed. This, indeed, is not disputed by the defendant so far as the physical adaptation of the device to the buildings goes. Of course, I recognize that no one could say in how many of these they could have succeeded in installing the preliminary and service test elevator; but it had not even installed one, until it learned that the court might hold it to some action. So much, therefore, for its actual discharge of the obligation to put the apparatus to practical use. It has certainly failed in a large number of cases where the patent could be used.

What, however, as to the efforts it has made, for it may well be that mere failure would not be ground for rescission, if the defendant had done what it could. Not only did they not succeed, but they tried in only 4 out of more than 30 contracts, and, perhaps most significantly of all, in one of those 4 succeeded without any difficulty, so far as appears, in December, 1910, in actually letting a contract, not long after they had been put under some pressure. This does not seem to me to be the whole-hearted good faith to which the complainant was entitled. The very existence of his property was limited in time to December 24, 1918, so that when the choice was made in April, 1907, it had only 11½ years more to run, which was the only period in which to profit by his discovery. Moreover, it was only from the latter part of that period that the great gains would be likely to come, for we all know that the early years, which introduce an invention, are apt to be lean. Every year of delay means a year's loss at the end which is the best part of the patent, if it should turn out to be successful, and cuts off the greatest harvests, if there be a future harvest at all. It is not, therefore, a question merely of a proportionate loss to Neenan from each year's delay. If time be ever of the essence, it is in a case of this sort. Nor is it an answer to say that Neenan is too sanguine; that may well be true, though it hardly lies in the defendant's mouth, after being so languid in ascertaining whether or not his hopes are too high. In any case he bargained for active exploitation in good faith, and I must say it does not seem to me that he has had that. Had the defendant met his proof by showing that they had tried in all the contracts to put in the device, or at least in all those in which there were not good reasons against it, I should perhaps think differently, even though they were in formal default; but is it tolerable that they should let contract after contract without any effort to put in the mere service test, contracts which they now do not try to show Neenan's device could not mechanically have filled? Every allowance ought to be made for a reasonable difference of business judgment and for the necessities of their own manufacture; Neenan was subject to those, when he went in with them; but under the excuse of a reasonable business opportunity, the defendant could not remain indefinitely passive. Their undertaking involved action by them, and Neenan had the right to have them treat his device on an equality with their own. While they were not formally in a fiduciary relation to him, the scope of their obligation is fairly to be interpreted with an eye upon the fact that his profits would come from their use of the property he had conveyed. At least he had a commercial interest in the property, nor did the guaranty in the least change the obligation to exploit the patent.

I must therefore conclude that the defendant has shown no adequate excuse for the delay of nearly two years in putting in the experimental elevator, and that such efforts as they made were not a sufficient compliance with the obligations of the contract. That delay has been followed by a further delay of nearly two years more, and is corroborative of their disposition towards the patent. A delay of two years goes, as I have shown, to the very heart of the consideration, for, though it amounts to little now, it lops off two years

upon the end of the monopoly, which, if it is successful, are its very cream. I think Neenan was not obliged to wait any longer and could sue when. he did.

The defendant urges that it has taken long to exploit several of its own machines, and that it can have no motive to discriminate against Neenan. As to the length of time in other cases, I can only say that it might well have been different, if there they had tried and failed, or had even given a reason for not trying; but they have done neither. Charles does say that in a few instances he believes the type of elevator was prescribed by the architect; but those cases are at most four, and it is extremely doubtful whether in two of those four the situation did not justify at least a suggestion of Neenan's device. As to motive, it is indeed a circumstance in the defendant's favor and I try to remember it. While it is not in the least necessary to find a motive, it is quite apparent that if a competing device be safely out of the way, as here, the stimulus for active and aggressive efforts to introduce it does not exist. There is no powerful motive to initiate a new development which is still tentative, when experience has proved the present devices quite satisfactory. Such an experiment certainly involves expense and possibly involves failure, with an attendant incidental injury to the whole business of him who brings it out. Moreover, while the royalties are very small, and could hardly be a determining factor in case of success, they were at least an added burden of 2 or 3 per cent., which, if competition be sharp, might be an inducement. In any case there appear to be possible motives for slackness of action.

However that may be, the fact is here that the defendant did not fulfill its obligation, and the right to rescind is made out.

The question of terms can in all probability be settled as well now as after a reference. It must speak as of the time of compliance with the decree and must try to put the parties in statu quo as of that date. Since the defendant has received nothing, it has no profits to account for. On the other hand, the complainant has received all told $13,000 which he must account for. The real question is as to how much of this sum the damages due to the defendant's default can constitute a set-off, and it is so clearly impossible to prove that as to make it idle to direct a reference to ascertain them. Should the defendant be charged with some sum for enjoyment of the patent? There is trouble in assuming that the minimum value to the defendant was at least equal to the guaranty; for it is possible that the royalties were themselves fixed at a lower sum than would have otherwise been the case just because of the guaranty, and, if so, the defendant was pro tanto paying in advance for royalties yet unearned. That is, however, an extremely unlikely supposition, because it was perfectly impossible to estimate even approximately what the future royalties would be, so that one could have any assurance that more than the guaranty would ever be earned at all. Besides the usual way, as in mining royalties, where the intention is that suggested, is to provide that so much of the guaranty as is not earned in one year may be set off against future royalties in any year in which the royalties exceed the guaranty. As there is no such provision here, it is less likely that the intention was that the guaranty was in any part payment for future royalties. While the matter is undoubtedly not free from doubt, some means must be struck which will effect substantial justice, and that most nearly in accord with the probable intention of the parties is to say that to value the yearly enjoyment of the patent at no less than $3,000. While this may turn out to be less than the value of the last years of the monopoly, if fruitful, of which Neenan has been deprived, it is all that can now be ascertained. On the other hand, it would be obviously unjust to make him repay the whole sum he has received, because the defendant has failed to receive what it ought to have tried to get.

The initial payment of $2,000 I regard as paid for an option on the patents, involving as it did their retention for three years. The complainant therefore need not be charged with that. The account will therefore charge Neenan with $8,000 with interest from April 11, 1907, and with $3,000 with interest from January 1, 1908. Against that he may credit himself with the value of the patent to the defendant from April 11, 1907, at the rate of $3,000.

I do not think that any interest can be added to the credits, since the allowance is neither for profits received, nor for damages suffered. It is rather upon a quantum meruit based upon the estimated value to the defendant of possession of the patents during the period in question. In such cases it is not generally the rule to award interest. Either party against which the account goes will pay to the other the balance due, and the defendant will reconvey the patents.

Complainant will have costs.

POST SCRIPTUM.—Counsel for the defendant has very kindly called to my attention a mistake in this opinion arising from the fact that paragraph 10 of the contract of May 24, 1904, covers only the patent not then issued, and indeed only issued on February 9, 1909, after the suit was brought. I can hardly see, however, that this in any sense changes the reasoning, or the result, for it is as though the patent, instead of having only 11 years, had 19, to run from April 11, 1907. My theory was that as the patent might be commercially successful, or at least as Neenan had the right to assume so, the last years would be the most fruitful, and that every year of delay in starting to exploit it would cut off a corresponding year of high returns. With this in mind, it makes no difference that the years cut off were at the end of 19 years instead of at the end of 11 years, so far as I can see. Indeed, the longer the term of the monopoly after the device becomes profitable, the higher the returns. What might have made a difference would have been for the defendant to stipulate that it might defer manufacture after acceptance till the patent had issued; but this they did not do, and they were therefore bound, before accepting the patent, to satisfy themselves that it would issue. This they apparently did, and in any case they were entirely protected by the cancellation clause. Besides, there was no commercial reason why the defendant should have waited after 1907 until the patent issued, nor does it urge that as a reason for inaction. There was small likelihood during those two years of the need of an actual patent to protect their rights, for infringements do not generally arise at the outset; indeed, the delay of issuance in the Patent Office, which was uncommon under the circumstances, was all to the advantage of both parties.

Ewing & Ewing (George H. Gilman and Thomas Ewing, Jr., of counsel), for appellant.

Knight Bros. (Harry E. Knight and Martin A. Ryan, of counsel), for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. The facts are so fully set out in the opinions delivered by the Judge of the Circuit Court and filed, respectively, June 2, 1910, May 22, 1911, and June 2, 1911, that it will not be necessary to restate them in detail.

[1] The dilemma in which the defendant is placed by the proofs is this: The Neenan patents are either for valuable inventions or they are not. If worthless, the defendant will not be injured, but on the contrary will be benefited, by re-assigning them on receiving the amount it has paid. If, on the other hand, the patents cover valuable inventions, the inventor is entitled to have them exploited during the lives of the patents. The gains, profits and advantages which may accrue from the patents the complainant is entitled to receive, either under the contract or as owner. It seems evident that no substantial gains will accrue to him under the contract. The defendant has had the right to install elevators embodying the patented inventions since May 24, 1904, nearly five years prior to the filing of the bill and has not installed a single one or earned a dollar for the

complainant under the contract. The intention of the parties, at least the intention of Neenan was to exploit the inventions as soon as possible. It was the duty of the defendant to test the apparatus with reasonable diligence and if the tests were satisfactory to install it within such reasonable time as was convenient. It did test the apparatus and found it satisfactory, but has wholly neglected to put it into practical use. Its conduct in this regard seems to indicate a purpose not to use the patented improvements but to prevent rivals in business from acquiring them. · Manifestly, the defendant does not intend to push the introduction of the inventions in an enthusiastic and energetic manner such as the complainant has a right to expect. The eighth clause of the contract gives the defendant a right to cancel it at any time. . The tenth clause must have a reasonable construction; otherwise the complainant is left at the mercy of the defendant and the contract is wholly unilateral. After the successful tests of the apparatus were made the defendant had such further reasonable time as was convenient in which to begin practical work. The tests were made in February and March, 1906, and the bill was filed February 5, 1909. There were then three years of idleness when no efforts were made to put the invention into practice, although several opportunities offered themselves. After the interlocutory hearing additional testimony was taken with the permission of the court and with the apparent consent of the defendant, to show further defaults continuing from April 11, 1909, up to August 1, 1910, a year and a half of this period being subsequent to the filing of the bill. Recent litigation has impressed upon the courts the difficulty of formulating in advance a rule by which to determine what is or is not reasonable, but, in a given case, we can say that we think the delay shown is unreasonable to such an extent as to justify the injured party in terminating an agreement. In the present case it is unnecessary to point out within exact limits what would have been a proper period in which to test and install the apparatus, but we are clearly of the opinion that the delay and supineness of the defendant, as shown by the testimony, justify the complainant in putting an end to the contract. It is not too much to say that the defendant, after it proved the invention to be a valuable one, wholly neglected to put it into practical use. This was not what the contract contemplated and was contrary to its spirit and letter as well.

[2] The complainant has no adequate remedy at law. No rational rule of damages can be formulated upon the facts as shown; any verdict rendered would have nothing but speculation and guesswork to support it. In such cases the right of the injured party to rescind is well recognized.

The complainant complains because the court did not require the defendant to pay interest upon the sum of $3,000 per annum which the defendant was required to pay. The complainant has not appealed or filed an assignment of errors, but, assuming that the question is before us we are not at all persuaded that there was error in the ruling of the court in this respect.

The decree is affirmed with costs.