**UNITED STATES of America**

**v.**

**COMBUSTION ENGINEERING, INC.**

**Civ. No. 13998.**

United States District Court,
D. Connecticut.

Dec. 19, 1972.

Atty. Gen. of the U. S. Richard W. McLaren, Asst. Atty. Gen. Baddia J. Rashid, Dept. of Justice, Antitrust Div., Washington, D. C., Norman H. Seidler, Bernard A. L. Friedman, Antitrust Div., New York City, Stewart H. Jones, U. S. Atty., Richard L. Winter, Asst. U. S. Atty., New Haven, Conn., for plaintiff.

Louis M. Winer, James G. Kenefick, Jr., New Haven, Conn., Seymour D. Lewis, Peter F. Nadel, New York City, for defendant.

## RULING ON MOTION FOR FURTHER ORDERS FOR ENFORCEMENT OF FINAL JUDGMENT

BLUMENFELD, Chief Judge.

This is a motion by the government requesting further relief in an antitrust case brought by the government in September 1970 and concluded a year later on September 8, 1971, when the court entered a consent decree proposed by the parties. By this motion, the government seeks "further" relief pursuant to the final judgment. For reasons that appear below, the motion is denied.

## I.

### History

The government's complaint alleged violations by the defendant Combustion Engineering, Inc. (hereinafter Combustion) of Section 7 of the Act of Congress of October 15, 1914, 15 U.S.C. § 18, commonly known as the Clayton Act, as amended.

Although no testimony was taken, nor were any issues of fact or law tried or adjudicated, a brief summary of the subject matter of the litigation gleaned from the pleadings and the judgment will place this motion in its proper context.

Combustion is a large corporation, significantly involved in several facets of the steam generating equipment business. In at least one aspect of this business, namely the sale of industrial boilers, by 1965 Combustion controlled a significant share of a rather concentrated market. In 1966, Combustion acquired the business and assets of the Wickes Boiler Division, a competing seller of industrial boilers, from Wickes Corp. The government, fearful that the effect of this acquisition might be to substantially lessen competition or to tend to create a monopoly in violation of Section 7 of the Clayton Act, initiated this suit seeking, inter alia, an order directing Combustion to divest itself of the business and assets acquired from the Wickes Corp. Thereafter, arduous and detailed negotiating between the parties was consummated in a proposed consent decree. Having satisfied itself as to the adequacy of that proposal, United States v. ITT, 349 F.Supp. 22 (D.Conn.1972), this court entered it as the final judgment.

## II.

### The Final Judgment

The final judgment, while similar in overall design to many of the decrees consented to by the government,[1] contains several provisions especially relevant to the present motion. Section III in general, and Section III(A) in particular, are at the heart of both the judgment and this present controversy. Section III(A) provides in relevant part that

". . . for the period from the effective date of this Final Judgment to September 1, 1972, (Combustion·shall)

---

1. In recent years approximately 75% of the antitrust actions initiated by the government have been concluded by the entry of consent judgments. See, e. g., ABA Antitrust Develop-ments: 1955–1968 at 226 (1968); Note, Flexibility and Finality in Antitrust Consent Decrees, 80 Harv.L.Rev. 1303 (1967).

. . . make continuous bona fide efforts to sell and consummate a sale of all of the assets acquired from the Wickes Corporation in 1966 . . . to a purchaser undertaking to operate said Wickes plant for the manufacture of industrial boilers . . . . "

The rest of Section III spells out in considerable detail the nature of the efforts to be made by Combustion to effect a sale, and specifies certain acts to be performed by Combustion when and if an "eligible purchaser" is identified.[2]

By Section IV, *infra,* a narrow provision was made for extension beyond the September 1, 1972, date of the provisions of Section III. Such extension was to be granted upon a proper showing by the government that an "eligible purchaser" existed who might reasonably be expected to buy the Wickes plant from Combustion.

Without regard to Combustion's success or failure in divesting itself of the Wickes Boiler Division, Section VI enjoins Combustion, for the ten year period following the date judgment was entered, from acquiring the assets of any seller or manufacturer of industrial boilers.

Finally, Section VIII contains the routine "retention of jurisdiction clause,"

see Note, *supra,* n. 1, 80 Harv.L.Rev. at 1308, which empowers the parties to petition the court for further orders so that the judgment may be "construed," "carried out," "modified," or "enforced." [3]

The divestiture of the Wickes Boiler Division not having been realized under the terms of the judgment, the government now moves for an implementing order, suggesting that the court appoint an independent third party to find buyers in order to consummate divestiture.

### III.

### *Preliminary Analysis*

■ Before dealing directly with the government's motion, it will be useful to consider the nature of the decree toward which it is directed. It is well established that consent decrees are not only permissible, but often desirable.

"The consent judgment is indispensable to antitrust enforcement. The Government notes that seventy percent of their antitrust judgments are consent decrees. Such decrees result from negotiation and thus typically may provide something less than the full relief prayed for (and often something more than that which the Government could obtain after trial).

---

2. E. g., Section III provides:
"* * * * * * *
"(C) Defendant shall offer to sell to the eligible purchaser, at reasonable prevailing prices therefor, for a period of one year from the date of sale, such boiler components and auxiliaries (drums, however, if in short supply, may be allocated on a fair and nondiscriminatory basis) manufactured by defendant as the purchaser may reasonably request for the production of industrial boiler products at the Wickes plant.
* * * * *
"(E) Defendant shall transfer to the eligible purchaser existing contracts, orders and work in progress (wherever scheduled to be performed) relating to industrial boilers normally made at the Wickes plant, upon such reasonable terms as they may agree; and shall supply to such purchaser all information as to (a) such contracts, orders and work in progress and (b) then current requests for offers or bids to sell such industrial boilers.

* * * * *

"(G) Pending any sale or transfer of the Wickes plant pursuant to the terms of this Final Judgment, defendant shall continue the normal operations of the Wickes plant, provided however, that defendant shall not be required to bid for and contract to produce industrial boilers for manufacture in the Wickes plant with delivery dates beyond September 1, 1972.

3. Section VIII provides:
"Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification of any of the provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof."

Litigation that might proceed for many years is avoided by utilization of this procedure. Its legality is beyond question . . . . " United States v. Blue Chip Stamp Co., 272 F. Supp. 432, 440 (C.D.Cal.1967), aff'd sub nom., Thrifty Shoppers Scrip Co. v. United States, 389 U.S. 580, 88 S. Ct. 693, 19 L.Ed.2d 781, rehearing denied, 390 U.S. 975, 88 S.Ct. 1026, 19 L.Ed.2d 1194 (1968).

See generally, United States v. Automobile Mfgrs. Ass'n, 307 F.Supp. 617, 621 (C.D.Cal.1969), aff'd per curiam sub nom., City of New York v. United States, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970); United States v. CIBA Corp., 50 F.R.D. 507, 514 (S.D.N. Y.1970); United States v. Carter Products, 211 F.Supp. 144, 147 (S.D.N.Y. 1962).

█ █ It is well established that the power to shape the remedy obtained by a negotiated consent decree resides only in the hands of the government. The court's share of the decisional load by its approval of a proposed decree consented to by the parties is a limited one:

"Apart from anything else, sound policy would strongly lead us to decline appellants' invitation to assess the wisdom of the Government's judgment in negotiating and accepting the 1960 consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting." Sam Fox Publishing Co. v. United States, 366 U.S. 683, 689, 81 S.Ct. 1309, 1312, 6 L.Ed.2d 604 (1961).

In this circuit the rule is that "it sufficed for the court to know that the parties had decided to settle, without inquiring why." Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798, 801 (2d Cir. 1960).

█ And, as a logical corollary to that rule, a consent decree once entered must be construed as it is written. That rule and its rationale are set forth in United States v. Armour & Co., 402

U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L. Ed.2d 256 (1971):

"Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." (Emphasis in original.) (Footnote omitted.)

IV.

█ Considering the government's motion in light of the foregoing principles, I find it difficult to ascertain the precise theory upon which it predicates what it has denominated its "PETITION OF THE UNITED STATES OF AMERICA FOR ORDERS AND DIRECTIONS FOR THE ENFORCEMENT OF FINAL JUDGMENT FILED SEPTEMBER 8, 1971." The

government's calculated failure to allege that Combustion was breaching any of the terms of the judgment, as well as its candid admission that it was not challenging the bona fides of Combustion's efforts (under Section III(A)), dispel any idea that the defendant has not complied with the judgment as written.[4]

Section III(A) requires Combustion " . . . for the period from the effective date of this Final Judgment to September 1, 1972, to make continuous bona fide efforts to sell and consummate a sale of all of the assets acquired from the Wickes Corporation in 1966, . . . ." The government does not contend that Combustion has failed to make such good faith efforts, or that September 1, 1972, has not come and passed.

The government's argument explicitly refrains from challenging *Armour's* rule of construction " . . . that a Judgment has no purpose of its own, that the parties have purposes which are often opposed to one another, and that a Judgment must be construed solely in the light of the language used within its four corners." (Government's Reply to Defendant's Memorandum at 3). The government's adherence to the accepted view that the latent meaning behind that which is immediately presented by the words used in a consent decree is not to be taken into account in ascertaining its manifest meaning is confirmed by its additional statement that "[p]laintiff's

position in this case is not one for construction of the Final Judgment." *Id.* Thus, the government's petition for relief refrains from asking this court to evade *Armour's* mandate by extrapolating from the language of the consent decree a "basic purpose"; and then "construing" the decree as if the parties had agreed to be bound by this "basic purpose" rather than by the terms of the decree, simpliciter.[5]

Similarly, although the government cited many cases pertinent to the standards to be applied when a party to a consent decree seeks modification of that decree,[6] the government adduced no evidence in support of a modification, and ultimately admitted with commendable candor that

" . . . the plaintiff is not seeking further orders for the modification of the Final Judgment . . . ." *Id.* at 7.

After this helpful delineation of what is *not* involved in the present proceeding, the government restates its request as one " . . . for further orders for the 'carrying out' and 'enforcement of compliance with' the provisions of the Final Judgment." *Id.* at 6.

In order to deal with the government's contention it will be useful to set forth the basis of its argument as stated in its brief:

"Section III(A) of the Final Judgment orders the defendant, for the pe-

---

4. Obviously disappointed by the fact that divestiture has not taken place, the government has, from time to time, contrasted Combustion's efforts to divest with the more vigorous attempts which it no doubt honestly believes a disinterested third party could make. However, this honest criticism did not appear, and was not taken by this court, to rise to the level of an implied allegation of contemptuous behavior.

5. This analysis is applicable without regard to whether it is the "basic purpose," "objective," or "aim" of a final judgment which is sought to be enforced. These semantic variations employed by the government are of no legal significance.

6. E. g., United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932)

(modification of consent decree); Chrysler Corp. v. United States, 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942) (modification of consent decree); System Federation No. 91 v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed. 2d 349 (1961) (modification of consent decree); United States v. United Shoe Machinery Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) (modification of litigated judgment); King-Seeley Thermos Co. v. Aladdin Industries, Inc., 418 F.2d 31 (2d Cir. 1969) (modification of litigated judgment); United States v. Shubert, 163 F.Supp. ·123 (S.D.N.Y.1958) (modification of consent decree). *Compare* United States v. Swift & Co., *supra, with* United States v. United Shoe Machinery Corp., *supra*, in light of United States v. Armour, *supra*, and Note, *supra*, n. 1, 80 Harv.L.Rev. at 1414.

riod from the effective date of their Final Judgment to September 1, 1972, to 'make continuous bona fide efforts to sell and consummate a sale,' of Wickes plant. Section III(F) provides that '[i]n accomplishing the *divestiture ordered* by subsection III (A)' defendant shall do certain things. "Section IV states that 'if defendant has not *divested* itself of the Wickes plant by August 1, 1972,' then, under certain circumstances, the September 1 date is automatically extended. It is very clear from the language used that the Final Judgment seeks divestiture by defendant of Wickes." *Id.* at 2 (emphasis in Government's Reply).

Having culled out the words in the inner quotes from within the four corners of the judgment, the government argues that they inescapably require that something more must be done in order to satisfy the terms of the decree. But the decree does not provide that. As might be expected, portions of three sentences culled out of context from three different paragraphs of the decree do not meld into an accurate statement of the true terms of the decree. Too much is lost in the transposition.

It is true that Section III(A) of the decree did order the defendant, for the period between September 1, 1971, its effective date, to September 1, 1972, to "make continuous bona fide efforts to sell and consummate a sale," of the Wickes plant. The kind of obligation imposed by this simple and understandable command that bona fide efforts to sell must be made cannot be equated with an absolute obligation to divest. The government argues that "[t]he distinction which the defendant seeks to

draw between a 'bona fide effort'[7] to accomplish divestiture and divestiture itself is meaningless." *Id.* at 3. There is no merit to this view. This is to interpret the phrase far too indiscriminately. It is not necessary for the court to put its own gloss on the phrase "bona fide effort." It has a long established legal significance often used in business transactions to impose an obligation to sell a product. Cf. Neenan v. Otis Elevator Co., 194 F. 414, 417, 114 C.C.A. 376 (C.C.S.D.N.Y.1911), aff'd, 194 F. 414, 419 (2d Cir. 1912). It has never been construed to require the promissor to consummate the sale of a product "come what may." The same principle was recognized in Bull v. Logetronics, Inc., 323 F.Supp. 115, 132 (E.D.Va. 1971): "Clearly, a party to a contract involving a patent need not exploit the patent, whatever the contract may read, if the patent is simply unmarketable."

If any further support for this interpretation of the significance of "good faith efforts to sell" is needed, it may be found in the particularized application of that phrase to the facts of this suit as spelled out in Section III(F) of the decree:

"In accomplishing the divestiture ordered by subsection III(A), defendant shall make known the availability for sale of the Wickes plant by ordinary and usual means, including advertising in financial publications of general circulation and in trade publications. Defendant shall furnish to all bona fide prospective eligible purchasers all necessary information, including existing current financial statements regarding the Wickes plant and shall permit such prospective eligible

---

7. Both parties in brief and in argument have attempted to rehash the private negotiations which led to this consent decree in order to illuminate the significance of this phrase, the government arguing that it was merely cosmetic. One would be doing rather less than justice to government's counsel if one were to suppose that so critical a point arose out of oversight or lack of understanding. On the

other hand, the defendant assures the court of its central importance to its decision to consent to the decree, and that it would not have consented to a decree which imposed an unconditional obligation on it to divest itself of the Wickes Division. Mention is made of these arguments simply to emphasize the fact that a "best efforts" clause is not the same as an absolute obligation to divest.

purchasers to make such inspection as may be reasonably necessary."

The government's argument fails to distinguish conduct from consequences. Only the former, expressly ordered by the terms of the decree, created an obligation fully dischargeable by Combustion. Resolution of the latter, encompassing the mutually exclusive possibilities of divestiture or nondivestiture, was left to the "invisible hand of the marketplace." That the decree falls short of imposing an absolute obligation of divestiture should not be regarded as an oversight, but rather as a conscious choice founded upon the realities of that market.[8]

The remaining prop for the government's argument, extracted from Section IV of the decree, may well be regarded as carrying its own self-destruct device:

"If defendant has not divested itself of the Wickes plant on or before August 1, 1972, upon application and showing to this Court by plaintiff that an eligible purchaser has expressed a bona fide interest in the purchase of the Wickes plant and that a reasonable expectation exists that a sale may be made to such purchaser, the provisions of Section III hereof shall be extended for a reasonable additional period of time to permit negotiations with such eligible purchaser to proceed to conclusion."

This section carefully circumscribes whatever uncertainty arguably exists as to the exact date for termination of the defendant's obligation to exercise good faith efforts to sell. The extension of time could be obtained by the government only on application and showing (1) that an "eligible purchaser" existed before August 1, 1972, who (2) expressed a bona fide interest in buying the Wickes plant, and (3) that there was reason to believe that continued negotiation would lead to a sale. No such showing has been proffered by the government.[9]

V.

The scope of a consent decree is measured as much by its limitations as by its affirmations. What has been presented by the plaintiff here does not establish a basis for determining that the affirmations in this one have not been met by the defendant, nor any ground for issuing any orders contrary to its limitations. Here, as in United States v. Armour & Co., *supra*, 402 U.S. at 683, 91 S.Ct. at 1758,

" . . . although the relief the Government seeks may be in keeping with the purposes of the antitrust laws, we do not believe that it is supported by the terms of the consent decree under which it is sought."

Accordingly, the motion is denied.

---

8. Several provisions in the decree reveal that the Wickes plant was only to be transferred to a purchaser capable of maintaining its productive capacity as a going concern. In the face of the apparent unwillingness of businessmen to purchase and operate this on-going boiler making business, it would make little sense in the context of Section 7 of the Clayton Act for the government to insist that the Wickes plan be scrapped.

9. In light of United States v. Armour, *supra*, there is no merit to the view that Section VIII (retention of jurisdiction clause) enables this court, as a matter of discretion, to order divestiture anytime after September 1, 1972, instanter. The government's bootstrap argument would not only transform a retention of *power* to enforce explicit substantive rights and liabilities into a Pandora's Box of additional, unlimited, and undefined substantive provisions, but also would raise grave constitutional questions and diminish the likelihood that parties to an antitrust suit would ever consent to a decree rather than litigate.

See, e. g., United States v. American Society of Composers, 331 F.2d 117, 123–124 (2d Cir. 1964), cert. denied sub nom., Shenandoah Valley Broadcasting, Inc. v. American Society of Composers, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048.