**D & H AUTO PARTS, INC.,**
Plaintiff,

v.

**FORD MARKETING CORPORATION,**
Defendant.

No. 70-C-1210.

United States District Court,
E. D. New York.

Jan. 5, 1973.

See also, D.C., 341 F.Supp. 989.

Harry T. Sherman, New York City, for plaintiff; and Louis I. Newman, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; by Robert MacCrate, Ulric R. Sullivan, New York City, of counsel.

JUDD, District Judge.

## MEMORANDUM AND ORDER

Plaintiff in this civil action has moved to set aside the jury verdict and grant a new trial.

D & H Auto Parts, Inc. (D & H) is a jobber and wholesaler in auto parts and accessories. It made a "Direct Account Sales Agreement" dated May 1, 1968 with Ford Motor Company, Autolite-Ford Parts Division, to act as a warehouse distributor of replacement parts, including Autolite spark plugs and batteries. Ford's obligations under the contract were assumed on or about July 1, 1970 by Ford Marketing Corporation (Ford), which had been created as a wholly owned subsidiary of the Ford Motor Company.

Ford's agreement with D & H, as with other direct account warehouse distributors, provided for three successive 10% discounts, as set forth in the Autolite-Ford Policy and Procedure Manual. The first 10% was allowed on all sales, whether to retailers or to others. The second 10%, called a redistribution allowance, was allowed only on sales to other jobbers or wholesalers on a list approved by Ford. The third 10%, called a recompensation allowance, was allowed only in respect of sales to fleets and governments, by approved wholesalers. Ford also allowed a 1% discount on all shipments over $50,000 and a 2% discount for prompt payment.

The contract was signed by the Autolite-Ford general sales manager in Detroit, and provided that it could not be modified except by writing signed by one of the Detroit officials.

There was no dispute of the fact that D & H during 1969 submitted claims for the recompensation allowance (the third 10% discount) on sales which were not to fleets or governmental units and inflated claims for the redistribution allowance (the second 10% discount) and that D & H received discounts on the basis of false certificates which it filed with Ford. A statement that these certificates were true and accurate was signed by Mr. Henry Horenstein, as Secretary of D & H, as part of every monthly claim. The contract provided for termination in the event of the sub-

mission of any false reports or of any refusal to permit an audit of the records relating to claims for discounts.

D & H asserts that its monthly claims for the third 10% or for excessive wholesale discounts were not really fraudulent because Ford salesmen directed it to file false statements and because the competitive situation required it to claim the third 10% (or its equivalent) in order to meet the prices at which other firms were selling Autolite spark plugs.

There were sharp issues concerning the authority of the Ford salesmen and the extent and *bona fides* of Ford's efforts to prevent other warehouse distributors from filing fraudulent claims similar to those filed by D & H.

When Ford in early 1970 sought to audit D & H sales records, as the contract permitted, it was put off by Mr. Horenstein, and finally told that there were no records which would support the claims. Ford thereupon imposed a charge-back of $63,068, set forth in a debit memorandum to D & H dated June 16, 1970.

Ford terminated the D & H contract by letter dated December 4, 1970, on the grounds of failure of D & H to pay for purchases when due and submission by D & H of false and fraudulent reports and claims.

In addition to the oral and documentary evidence concerning misrepresentations and alleged authorization by Ford, it was necessary for both sides at the trial to prove the amounts that were involved. D & H as plaintiff took the initiative, by showing the amount of its sales, in order to establish its claim for loss of profits from the alleged wrongful cancellation of its contract. Ford in turn had the burden of showing the amount of the fraudulent claims and the amount of unpaid bills.

Three sets of documents were involved, Forms 7380, Forms 9375, and monthly statements of account.

Forms 7380 were the monthly claim forms submitted by D & H and signed by Mr. Horenstein, setting forth by name and amount the sales to approved wholesalers, fleets, and governments, on which second and third 10% discounts were claimed. The D & H 7380 forms for the entire period in suit were put in evidence by plaintiff without objection.

Forms 9375 were forms prepared by Ford, from information received from its distributors, and fed into computers and prepared as printouts.

The 9375 forms, constituting monthly summaries of sales, were prepared for internal use in the Ford organization. They were compiled from punch cards prepared each day in Ford's regional office at Teterboro, New Jersey, which recorded the individual orders received on that day. The cards were double-punched to eliminate errors. The punch cards were then shipped to Detroit, where the information was stored in a computer. Printouts from the computer were checked by the regional depots so as to be sure that they conformed with the local records. Errors occurred on rare occasions.

The 9375 forms were not normally forwarded to the individual dealers, but they were part of the information which was provided to the plaintiff in the course of the extensive pretrial discovery.

The information in the computer was used also, however, to prepare the monthly statements of account, which were sent to customers.

D & H offered the 9375 forms for 1968 in evidence on its affirmative case on damages for breach of contract, because they showed the amounts of its purchases. Ford then relied on the 9375 forms, and summaries of them, to show the number of spark plugs actually bought by D & H, as compared with the discounts claimed on the 7380 forms.

Plaintiff objected to the use of the 9375 forms for 1969, on the ground that there was insufficient proof of the accuracy of the computers, but the court ruled that they could be received as business records under the facts in the case.

## The Verdict

The jury found separate verdicts with respect to plaintiff's two claims and Ford's two counterclaims. Specifically, it found that Ford had not breached its contract by terminating it under the December 4, 1970 notice; and that Ford had not breached its contract by refusing to fill orders. With respect to the counterclaims, it found D & H liable to Ford for $42,045.34 for reimbursements for overpayments based on false claims; and found D & H liable for $31,171 with respect to Ford's claim for unpaid amounts due for merchandise sold and delivered.

The verdict represented approximately two-thirds of Ford's claim for overpayments and the full amount of its claim for unpaid invoices.

### Discussion of Law

1. *Admissibility of Forms 9375*

Plaintiff's principal argument is directed to the court's admission of the 9375 forms (Exhibits D–1 to 24) as evidence of the amount of fraudulent overclaims submitted by D & H. These exhibits were the same as Plaintiff's Exhibits 130 and 131, which had been marked on plaintiff's direct case. Plaintiff was permitted to withdraw its offer of Exhibit 131 (the 1969 forms), but it has not shown any reason why the forms for one year should be treated any differently from those for another year.

■ There was evidence that the 9375 forms were prepared each month in the regular course of Ford business, for the use of management. The fact that computers were used in compiling the data for these reports does not impair their admissibility as business records under 28 U.S.C. § 1732(a), which provides:

In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

The admissibility of computer printouts, even against a stranger, and in a criminal case, was approved in United States v. De Georgia, 420 F.2d 889 (9th Cir. 1969).

■ In this case the plaintiff had an opportunity to cross-examine the assistant comptroller, William A. Beers, who had charge of Ford's field accounting department, general office accounting department, credit department, and incentive control and analysis department. It is true that Ford did not produce the head of its central data processing department, but the assistant comptroller testified concerning his department's checking of the data from the central data processing department. Under the Business Records Act, the absence of testimony from other Ford personnel "may be shown to affect its weight, but such circumstances shall not affect its admissibility." Ford had no duty to produce any other witnesses.

■ The validity of plaintiff's objection to the 9375 forms is particularly questionable in the light of its having had them in its possession from December 1971 until the trial in June 1972, its having included them among the exhibits which it pre-marked, and its failure to point out any area of inaccuracy. As the court stated in Olympic Insurance

Co. v. Harrison Incorporated, 418 F.2d 669, 670 (5th Cir. 1969):

> In view of the appellants' failure to list any specific objections as to the accuracy of the printouts, we cannot say that the district court erred in relying on them as the basis for its judgment.

The 9375 forms were routinely prepared documents not produced specifically for purposes of litigation. They were prepared from facts supplied by the plaintiff, i. e., from the D & H orders, and were capable of verification by the plaintiff. They were obviously relied on by Ford as sufficiently accurate for its business purposes.

A leading writer on computer law, Roy N. Freed, in A Lawyer's Guide Through the Computer Maze, 6 Prac.Law 15, 28 (Nov. 1960), stated:

> In relying upon data processing by a machine, there should be no more necessity for oral testimony concerning the reliability of the machine operations than that of the manual procedure supplanted, whether it be bookkeeping, order preparation, or mathematical computation.

Plaintiff quotes from Judge John R. Brown's article on Electronic Brains and the Legal Mind: Computing the Data Computer's Collision with Law, 71 Yale L.J. 239 (1961), but plaintiff's brief omits the warnings in this early article on computers that (pp. 248, 249):

> It is at this point that law should be the most cordial in its reception of this new facility. . . .

> Each niggardly or adverse decision represents the threat that all will expand cumulatively into a hostile rule from which legislation, years later, will be the only escape.

Commenting on the Uniform Business Records as Evidence Act, Judge Brown stated (p. 248, n. 18):

> It should be helpful that this Act refers only to records and does not use

terms such as "writings" and "books" which might be more limiting.

If there are cases where additional authentication of computer printouts is necessary, this is not such a case.

### Conclusion

Plaintiff has shown no basis for interfering with the jury's verdict that Ford did not breach its contract by serving a notice of termination and that Ford did not breach its contract by refusing to fill orders. Plaintiff's objections to the adequacy of Ford's proof of the amount of fraudulent overclaims and the amount of unpaid bills are insubstantial.

It is ordered that the motion to set aside the jury verdict is denied.